## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF MICHIGAN

## SOUTHERN DIVISION

BEVERLY ZIMMERMAN, et al., *on behalf of*

*themselves and all others similarly situated*,

      Plaintiffs,

v.

THE 3M COMPANY f/k/a Minnesota Mining

and Manufacturing Co., et al.,

      Defendants.

Case No. 1:17-cv-1062

HON. JANET T. NEFF

### SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT WITH INDIVIDUAL CLAIMS AND DEMAND FOR JURY TRIAL

Beverly Zimmerman, Ronald and Therese Cooper, Dennis and Malia Gregory, Mark and Heidi Hill, Megan and Michael Johns and Terry and Michelle Van Wuffen (collectively, "Plaintiffs"), individually and on behalf of others similarly situated, file this Second Amended Consolidated Class Action Complaint with Individual Claims and Demand for Jury Trial against The 3M Company f/k/a Minnesota Mining and Manufacturing Company ("3M") and Wolverine Worldwide, Inc. ("Wolverine") (collectively, "Defendants"), and state as follows:

### NATURE OF THE CASE

1.    Plaintiffs, individually and on behalf of all others similarly situated, bring this lawsuit to recover damages and injunctive relief and to obtain other remedies for injuries from Defendants, who manufactured, sold, used, and disposed of hazardous chemicals in the

environment in Kent County, Michigan.  Specifically, Defendants caused the release of certain chemicals including, but not limited to, per- and poly-fluoroalkyl substances ("PFAS") into the environment by negligently and unlawfully disposing of and dumping them at various locations in Kent County, Michigan.  These hazardous chemicals migrated into and contaminated Plaintiffs' and Class members' private wells, which supply their homes with drinking and tap water.

2.      PFAS are a class of man-made chemicals that are not found naturally in the environment.  PFAS include perfluorooctanic acid ("PFOA") and perfluorooctane sulfonate ("PFOS"), the two most used and studied PFAS chemicals.[1]  PFOA and PFOS are highly toxic and are hazardous to human health and the environment.

3.      Studies have concluded that exposure to PFOA and PFOS can cause adverse health effects, including, but not limited to, detrimental developmental effects on fetuses exposed during pregnancy or to breastfed infants (*e.g.,* low birth weight,  accelerated puberty, skeletal variations), cancer (*e.g.,* testicular,  kidney), liver effects (*e.g.,* tissue damage), immune effects (*e.g.,* antibody production and immunity), gastrointestinal effects (*e.g.,* ulcerative colitis), thyroid effects, and other conditions (*e.g.,* cholesterol changes).

---

[1] Additional PFAS compounds detected in private wells include: PFHxS Perfluorohexane sulfonate; PFOSA Perfluorooctane sulfonamide; PFNA Perfluorononanoate; PFDeA Perfluorodecanoate; Et-PFOSA-AcOH 2-(N-ethyl-perfluorooctane sulfonamido) acetate; Me-PFOSA-AcOH 2-(N-methyl-perfluorooctane sulfonamido) acetate.

4.      In the 1940s and 1950s, 3M began creating PFAS compounds and incorporating them into its products, including its Scotchgard brand products, after recognizing their surfactant properties.

5.      In the late 1950s, Wolverine, a shoe manufacturer located in Rockford, Michigan, began incorporating PFAS-containing Scotchgard, sourced by 3M, into its own manufacturing operations.

6.      As part of its operations, Wolverine unlawfully and negligently dumped PFAS-containing waste in various locations within Kent County.

7.      Wolverine's unlawful and negligent dumping of toxic PFAS at various dump sites in Kent County, and even directly into the Rogue River itself, caused ever-expanding contamination of area water supplies, including Plaintiffs' and Class members' private wells.

8.      State officials attribute the PFAS contamination in Kent County to the migration of 3M's toxic PFAS chemicals dumped by Wolverine, and, indeed, Wolverine has admitted to dumping these hazardous chemicals in Kent County.

9.      For decades prior to public awareness of the contamination, Defendants misrepresented and fraudulently concealed their use and disposal of PFAS substances.

10.     By no later than the 1950s, 3M knew that the PFAS chemicals, which it used to manufacture its Scotchgard brand products, posed substantial risks to human health and the environment.

11.     Indeed, 3M went to great lengths to distort the scientific community's understanding of the serious health effects posed by PFAS.  3M funded industry-friendly research, while simultaneously paying to ensure that less favorable research would be suppressed.  For decades, 3M failed to report to the United States Environmental Protection

3

Agency ("EPA") important and legally required information regarding the adverse health effects of PFAS—a failure for which it eventually paid a large settlement to the EPA.

12.     Correspondence between 3M and Wolverine confirms that Wolverine knew PFAS were in its manufacturing processes at least as early as 1998, and likely earlier.  3M advised Wolverine that Scotchgard contained PFOS, which bio-accumulates in the environment and human body.  Moreover, 3M advised Wolverine to limit human and environmental exposure to PFOS.

13.     Despite Wolverine's knowledge of the toxic nature of the PFAS used in its manufacturing process, and awareness of the PFAS contamination from its facilities and disposal into dump sites throughout Kent County, Wolverine did nothing to abate, remedy, or mitigate the contamination it created, nor did it advise Plaintiffs or Class members of the hazards to persons and property its unlawful dumping was creating.

14.     Moreover, when Wolverine's PFAS dumping initially came to public light, the company falsely claimed that "[i]n fall 2016, Wolverine *first learned* that PFOS may have been present in compounds used at its former tannery in Rockford."

15.     Wolverine clearly knew that the Scotchgard it was using in its manufacturing contained PFAS and that it was hazardous to the environment and human health.  Wolverine intentionally concealed those facts from the public, including Plaintiffs and Class members.  As a result of Defendants' fraudulent concealment, Plaintiffs and Class members only recently learned of Defendants' negligent manufacture, use, and disposal of PFAS.

16.     Plaintiffs and Class members have and will continue to experience harms resulting from Defendants' negligent manufacture, use, handling, disposal, and dumping of PFAS into the

4

environment, including, but not limited to, interference with their property rights and increased risk for the development of serious illness caused by PFAS exposure.

17.     The PFAS contamination has and will continue to stigmatize Plaintiffs' and Class members' properties, adversely affect their property values, and negatively impact their ability to use and enjoy their properties.

18.     For these reasons, and as set forth in detail below, Plaintiffs and Class members seek relief and compensation from Defendants for and/or from the contamination of their drinking water, the interference with, and disruption of, the quality of their lives by being unable to consume or otherwise use their water, the loss of their right to quiet use and enjoyment of their properties, the diminution of the values of their properties as a result of Defendants' wrongful conduct, and the substantial risk of imminent harm from the continuing increased risk of contamination.

## **PARTIES**

19.     Beverly Zimmerman is a resident of Belmont, Michigan 49306 in Kent County, Michigan and was exposed to PFAS, including but not limited to PFOA and/or PFOS, through drinking water supplied by her residential well and her property interests have been  impaired by PFAS contamination, including but not limited to PFOA and/or PFOS, or the substantial risk of imminent harm from the continuing risk of such contamination.

20.     Ronald Cooper is a resident of Rockford, Michigan 49341 in Kent County and was exposed to PFAS, including but not limited to PFOA and/or PFOS, through drinking water supplied by his residential well and his property interests have been impaired by PFAS contamination, including but not limited to PFOA and/or PFOS, or the substantial risk of imminent harm from the continuing increased risk of such contamination.

21.     Therese Cooper is a resident of Rockford, Michigan 49341 in Kent County and was exposed to PFAS, including but not limited to PFOA and/or PFOS, through drinking water supplied by her residential well and her property interests have been impaired by PFAS contamination, including but not limited to PFOA and/or PFOS, or the substantial risk of imminent harm from the continuing increased risk of such contamination.

22.     Dennis Gregory is a resident of Rockford, Michigan 49341 in Kent County and was exposed to PFAS, including but not limited to PFOA and/or PFOS, through drinking water supplied by his residential well and his property interests have been impaired by PFAS contamination, including but not limited to PFOA and/or PFOS, or the substantial risk of imminent harm from the continuing increased risk of such contamination.

23.     Malia Gregory is a of Rockford, Michigan 49341 in Kent County and was exposed to PFAS, including but not limited to PFOA and/or PFOS, through drinking water supplied by her residential well and her property interests have been impaired by PFAS contamination, including but not limited to PFOA and/or PFOS, or the substantial risk of imminent harm from the continuing increased risk of such contamination.

24.     Heidi Hill is a resident of Rockford, Michigan 49341 in Kent County and was exposed to PFAS, including but not limited to PFOA and/or PFOS, through drinking water supplied by her residential well and her property interests have been impaired by PFAS contamination, including but not limited to PFOA and/or PFOS, or the substantial risk of imminent harm from the continuing increased risk of such contamination.

25.     Mark Hill is a resident of Rockford, Michigan 49341 in Kent County and was exposed to PFAS, including but not limited to PFOA and/or PFOS, through drinking water supplied by his residential well and his property interests have been impaired by PFAS

contamination, including but not limited to PFOA and/or PFOS, or the substantial risk of imminent harm from the continuing increased risk of such contamination.

26.     Megan Johns is a resident of Belmont, Michigan 49306 in Kent County and was exposed to PFAS, including but not limited to PFOA and/or PFOS, through drinking water supplied by her residential well and her property interests have been impaired by PFAS contamination, including but not limited to PFOA and/or PFOS, or the substantial risk of imminent harm from the continuing increased risk of such contamination.

27.     Michael Johns is a resident of Belmont, Michigan 49306 in Kent County and was exposed to PFAS, including but not limited to PFOA and/or PFOS, through drinking water supplied by his residential well and his property interests have been impaired by PFAS contamination, including but not limited to PFOA and/or PFOS, or the substantial risk of imminent harm from the continuing increased risk of such contamination.

28.     Michelle Van Wuffen is a resident of Rockford, Michigan 49341 in Kent County and was exposed to PFAS, including but not limited to PFOA and/or PFOS, through drinking water supplied by her residential well and her property interests have been impaired by PFAS contamination, including but not limited to PFOA and/or PFOS, or the substantial risk of imminent harm from the continuing increased risk of such contamination.

29.     Terry Van Wuffen is a resident of Rockford, Michigan 49341 in Kent County and was exposed to PFAS, including but not limited to PFOA and/or PFOS, through drinking water supplied by his residential well and his property interests have been impaired by PFAS contamination, including but not limited to PFOA and/or PFOS, or the substantial risk of imminent harm from the continuing increased risk of such contamination.

30.     Defendant Wolverine is a Delaware corporation with a principal place of business

located at 9341 Courtland Drive NE, Rockford, Michigan 49351.  Wolverine manufactures footwear and used Scotchgard, a PFAS containing product manufactured by 3M, in its manufacturing process.

31.     Defendant 3M is a Delaware corporation with a principal place of business located at 3M Center, St. Paul, Minnesota 55133.  3M manufactured Scotchgard and sold it to Wolverine for use in its manufacturing processes.

## JURISDICTION AND VENUE

32.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act,) 28 U.S.C. §§ 1332(d)(2) and (d)(6), because there is diversity of citizenship and  the claims of individual Class members, in the aggregate, exceed the jurisdictional minimum of $5,000,000, exclusive of interest and costs.

33.     Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the acts and practices complained of herein occurred in this District and each Defendant has transacted substantial business within this District.

## FACTUAL BACKGROUND

A.      **Use and disposal of PFAS-containing products in Kent County**

34.     Defendant Wolverine was founded in Grand Rapids, Michigan in 1883 and built its first tannery in Rockford, Michigan in 1908 under the name Hirth-Krause.  In 1921, Hirth-Krause and the Rockford Shoe Factory combined to become Wolverine.

35.     Wolverine invented pigskin nubuck in 1956, a new material, which required chemical treatment in order to obtain the desired qualities of weather resistance and water stain repellency.  To achieve this, Wolverine collaborated with 3M.

36.     According to 3M's own account of its history with Wolverine, 3M and

Wolverine's chemists collaborated to formulate a product that would achieve the desired repellent qualities that Wolverine was seeking.

37.     In 1958, shortly after 3M put Scotchgard on the market, Wolverine began using PFAS-containing Scotchgard at its tannery in Rockford, Michigan and launched its Hush Puppies brand.

38.     Upon information and belief, Wolverine used PFAS-containing Scotchgard as an integral part of it manufacturing processes on a regular basis, treating leather and finished shoes with the chemical to weatherproof its products.

39.     For decades, 3M concealed the toxic nature of PFAS from the public, including Plaintiffs and Class members.  By at least 1998, however, 3M made Wolverine fully aware of the potentially hazardous nature of PFAS, including the risks of harm to human health and the environment.

40.     Despite this knowledge and throughout the course of its operations in Rockford, Michigan, Wolverine engaged in grossly negligent practices including the dumping and disposal of its tannery and manufacturing waste at various locations, some yet to be identified, throughout Kent County, Michigan.

41.     Upon information and belief, this waste included sludge from the manufacturing and tannery processes, chemicals, and leather and footwear scraps, all of which were contaminated with PFAS and other chemicals.

42.     3M and Wolverine's negligent manufacturing, handling, and disposal of toxic PFAS containing waste resulted in the discharge of PFAS and other chemicals into Kent County's soil, groundwater and surface waters, and, ultimately, Plaintiffs' and Class members' private wells and drinking water.

43.     Upon information and belief, neither Wolverine nor 3M advised the local community, federal, state, or local authorities, or regulatory agencies of the wrongfully dumped and disposed of toxic waste in Kent County, which posed the potential to contaminate public and private drinking water sources.

44.     Defendants each had a vested interest in concealing the contamination from the public, including Plaintiffs and Class members.

45.     Defendants failed to remediate the presence of hazardous chemicals in Kent County and caused contamination of Plaintiffs and Class members' private drinking water sources.

**B.  Disclosure of the PFAS contamination in Kent County**

46.     Wolverine dumped its tannery waste and manufacturing waste at various locations throughout Kent County.  Upon information and belief, this waste included sludge from the manufacturing and tannery processes, chemicals, and leather and footwear scraps, all of which were contaminated with PFAS.

47.     At Wolverine's tannery, Wolverine employees, at the direction and/or with the approval of corporate officers, washed out and discharged remaining PFAS solution on a daily basis, resulting in discharge into the environment, soil, and nearby waterways.

48.     Wolverine employees, at the direction and/or with the approval of corporate officers, dumped sludge and toxic waste at various landfills and other sites throughout Kent County.

49.     From approximately 1964 to 1978, Wolverine owned a dump site located at 1855 House Street, N.E., Plainfield Township, Michigan (the "House Street dump site"), where it dumped and maintained toxic PFAS waste from its facilities.

50.     The House Street dump site has been dubbed "Leather Hill" by local residents as a result of the decaying metal barrels, scraps of old, rotting leather, and other toxic tannery waste that have become enmeshed with the surrounding vegetation.

51.     Indeed, Chris Hufnagel, Senior Vice President for Wolverine, recently explained that Wolverine's unlined House Street dump site was used to dispose of "byproducts from the company's tannery in downtown Rockford."

52.     In May 2017, the United States Belmont Armory, located less than one mile from Wolverine's House Street dump site, performed an internal test of its drinking water pursuant to a National Guard Bureau internal assessment.  Despite the armory never having used PFAS, its drinking water contained PFAS at an alarming level of 96.9 ppt.

53.     The Belmont Armory immediately issued a "do not drink or cook" notice to its facility manager.

54.     Thereafter, the Michigan Department of Environmental Quality ("MDEQ")[2] identified Wolverine as the potentially responsible party for the Belmont Armory's PFAS contamination.

55.     Wolverine informed the MDEQ that it would test residential wells around its House Street dump site for PFAS but only if the MDEQ allowed Wolverine to "have a role in the communications" residents received about the contamination.

56.     The MDEQ agreed to this arrangement, and Wolverine drafted letters to residents requesting permission to sample their wells for PFAS.  The letters failed to mention Wolverine's role in the contamination.  Moreover, Wolverine directed the MDEQ to print the letters on MDEQ

---

[2] The MDEQ was recently renamed the Michigan Department of Environment, Great Lakes and Energy ("EGLE").  This Complaint refers to the agency as the MDEQ, as most of the events described herein occurred before the agency's rebranding.

letterhead and include only MDEQ as the signatory.  The MDEQ agreed.

57.  The MDEQ reached out to approximately twenty-six homeowners in Kent County with Wolverine's ghostwritten letter requesting permission to sample their wells for PFAS. Twenty-one homeowners agreed to have their wells sampled.

58.  Subsequently, after the initial group of wells tested positive for PFAS, the MDEQ and Wolverine expanded the well water sampling program to include an additional 200 wells. This additional testing area was dubbed the "buffer zone."  Residential wells in this zone have tested as high as 37,800 ppt for PFOA and PFOS.

59.  After homes in the buffer zone tested positive for PFAS, the MDEQ and Wolverine expanded the well water sampling program again to include an additional 300 wells. This additional testing area was dubbed the "southeast expansion area."

60.  Then, after homes in the southeast expansion area tested positive for PFAS, the MDEQ and Wolverine expanded the well water sampling program again to include an additional 200 wells in two separate neighborhoods.  These additional testing areas were dubbed the "Jewell Avenue" and "Wolven Avenue" testing zones.  Residential wells in this zone have tested as high as 59,100 ppt for PFOA and PFOS.

61.  Upon information and belief, Wolverine also dumped tannery and manufacturing waste directly into the Rogue River and Rum Creek located adjacent to its facilities, as evidenced by the presence of identifiable footwear debris in mud flats, locally termed the "the Island of Lost Soles."  Recent tests of sediments from the Rogue River and Rum Creek revealed PFOS levels up to 12,400 ppt.

62.  Monitoring wells at Wolverine's tannery site have detected PFAS levels at a shocking 490,000 ppt.

63.    As of February 8, 2018, the PFAS testing zones had expanded to cover approximately 15 contiguous square miles within Kent County, as depicted by the map on the following page, released by local news media.



64.    In November 2018, the MDEQ and EPA delineated at least three primary and three secondary plumes emanating from three distinct Wolverine disposal sites, described by the

13

MDEQ as "PFAS Source Areas."

65. The three identified Wolverine PFAS Source Areas are: the House Street dumpsite, the former Wolverine tannery site, and a residential development known as Wellington Ridge, located in the Wolven/Jewell study area. Wellington Ridge was built on top of a former gravel pit where Wolverine disposed of PFAS-containing waste.

66. The map below, released by the MDEQ and the EPA in November 2018, depicts the agencies' understanding, at that time, of the plumes emanating from each of the three Wolverine PFAS Source Areas.



67.     As the investigation is still ongoing, the Kent County PFAS contamination is not necessarily limited to those areas identified above.

68.     Further, Plaintiffs' and the Class Members' property interests have been impaired by PFAS contamination, including but not limited to PFOA and/or PFOS, or the substantial risk of imminent harm from the continuing increased risk of such contamination.

69.     Defendants' actions created an imminent, immediate, and continuing increased risk of harm from the continuing increased risk of such contamination.

70.     Moreover, Defendants have failed to fully remove the PFAS from the Source Areas, or otherwise remediate or abate the plumes of contaminant, which are mobile and will contaminate the aquifers and wells in their paths.

71.     Indeed, the Kent County Health Department ("KCHD") has prohibited the construction of new wells within certain PFAS study areas because of the Michigan Department of Health and Human Services' ("MDHHS") determination that the aquifers across most, if not all, of the impacted areas pose potential health risks to residents who have in the past, or may in the future, use the groundwater as a drinking water source.

72.     In the winter of 2019, the KCHD and the MDHHS began the North Kent County PFAS Exposure Assessment to investigate the public health risks posed by the PFAS contamination in the area.

73.     The North Kent County PFAS Exposure Assessment targets Kent County residents with detectable levels of PFAS in their residential wells.  The Assessment program provides blood testing to test the residents' blood for detectable levels of PFAS and retests their well water for detectable levels of PFAS.

74.     While the results of the North Kent County PFAS Exposure Assessment have

yet to be made public, several residents have received their PFAS blood test results, with many revealing the presence of PFAS at hundreds or thousands of times the national background average.

**C.    The Toxic impact of PFAS on Human Health and the Environment**

75.    PFOA and PFOS are part of a class of manmade chemicals created by replacing the hydrogen atoms on a carbon chain with fluorine atoms, thereby creating a fluorinated compound. These synthetic and very stable compounds can vary in length and are known as per- and poly-fluoroalkyl substances or PFAS.  These fluorinated chemicals are not found naturally in the environment.

76.    Due to their chemical structure, PFOA and PFOS are biologically and chemically stable in the environment.  As a result, they persist in the environment, resist environmental degradation processes and remain long after they are initially discharged.

77.    Because of their persistence and ability to easily migrate from soil to ground and surface water, PFAS chemicals can contaminate entire water systems, causing serious environmental and health issues.

78.    PFAS chemicals cannot be removed, nor their effects mitigated, by boiling water or by treating the water with chlorine or other disinfectant chemicals that are typically used in public drinking water systems.

79.    PFAS chemicals bioaccumulate in living organisms, primarily in the blood serum, kidney, and liver, meaning the chemicals concentrate and remain in the human body.

80.    Humans can be exposed to PFAS on a daily basis through consumption and absorption of contaminated water.

81.    PFAS can also be passed from mother to infant through breastfeeding and in utero

through the umbilical cord.

82.     The bioaccumulative effect is, therefore, a problem of frightening proportions.

83.     PFAS exposure is associated with increased risk in humans of testicular cancer, kidney cancer, prostate cancer, thyroid disease, high cholesterol, high uric acid levels, elevated liver enzymes, ulcerative colitis, and pregnancy-induced hypertension, among other health issues.

84.     PFAS exposure has also been demonstrated to have adverse developmental effects on fetuses during pregnancy and on breastfed infants.

85.     In 2005, an Environmental Working Group analysis of PFOA, performed according to internal EPA guidelines for assessing the carcinogenic potential of a chemical, found that PFOA is a "likely" human carcinogen. This categorization of "likely carcinogen" requires that just one of five EPA cancer criteria is met. The analysis concluded that the chemical met three of the five criteria.

86.     The C8 Health Project—a study relating to PFOA contamination from a DuPont chemical plant—was conducted to report on the health effects of elevated PFOA in the human body arising from exposures like those of Plaintiffs and Class members.

87.     From 2005 to 2013, the C8 Science Panel carried out exposure and health studies in affected Mid-Ohio Valley communities and concluded that there was a "probable link" between PFOA exposure and testicular cancer, kidney cancer, thyroid disease, ulcerative colitis, high cholesterol, and pregnancy-induced hypertension.

88.     The health conditions set forth above can arise months or years after PFOA-PFOS exposure.

89.     In May 2006, the EPA Science Advisory Board stated that PFOA cancer data is consistent with guidelines suggesting exposure to the chemical is "likely to be carcinogenic to

humans."

90.    In 2016, a peer-review panel of scientists, including epidemiologists, toxicologists and microbiologists, agreed with the U.S. Department of Health & Human Services National Toxicology Program's finding that PFOA and PFOS can harm the human immune system.

91.    In 2012, the EPA included PFOA and PFOS in its Third Unregulated Contaminant Monitoring Rule. The Unregulated Contaminant Monitoring Rule is a mechanism prescribed under the 1996 Safe Drinking Water Act that requires the EPA to issue a new list of no more than thirty unregulated contaminants to be monitored by public water systems every five years.

92.    In 2015, Harvard's School of Public Health and the University of Massachusetts-Lowell found that no contamination level higher than 1 ppt is safe for PFOA in drinking water.

93.    In June 2019, the Michigan PFAS Action Response Team's Science Advisory Workgroup announced new health-based PFAS values for the MDEQ to draft PFAS drinking water regulations and standards for the State of Michigan. The health-based PFAS values promulgated by the Science Advisory Workgroup are 16 ppt for PFOS, 8 ppt for PFOA, 6 ppt for PFNA, and 51 ppt for PFHxS.

94.    In 2015, the United States Department of Health and Human Services Agency for Toxic Substances and Disease Registry ("ATSDR") set a Minimum Risk Level ("MRL") of $2 \times 10^{-5}$ mg/kg/day for PFOA and $3 \times 10^{-5}$ mg/kg/day for PFOS. An MRL is an estimate of the amount of a chemical a person can eat, drink, or breathe each day without a detectable risk to health.

95.    In June 2018, the ATSDR issued a draft Toxicological Profile for Perfluoroalkyls which recommends reducing the MRL for PFOA to $3 \times 10^{-6}$ mg/kg/day (a decrease by a factor of 6.7) and the MRL for PFOS to $2 \times 10^{-6}$ mg/kg/day (a decrease by a factor of 15).

96.    The scientific research with regard to limits for PFAS concentrations clearly

reflects that lower limits are essential to protect drinking water and human health.

**D.      3M's Fraudulent Concealment of the Toxic Nature of PFAS**

97.     Defendant 3M, a multinational conglomerate, was founded in 1902 as the Minnesota Mining & Manufacturing Company.  It merged under the name 3M Company in 2002 and manufactures a broad array of chemical products for residential and commercial use.

98.     3M began researching PFAS chemicals in the 1940s and started commercial production of PFAS in the early 1950s.

99.     3M's products were based on a formula that 3M chemists discovered in 1952 while researching the chemicals for a different application.  While experimenting with fluorochemicals that could be used in aircrafts that would be resistant to degradation from jet fuel, its chemists stumbled upon a chemical formula that had durable stain and water repellent qualities.  This chemical formula, which included perfluorooctanesulfonamide ("PFOSA"), a precursor to PFOS, would catapult 3M to the forefront of the industry in stain and weather proofing products.

100.    3M used PFAS to manufacture consumer, commercial, and industrial products, including water-proofing and stain proofing products, fire suppressants, and other products.

101.    In 1956, 3M began marketing and selling its new PFAS chemicals under the brand name Scotchgard for use in waterproofing, stain proofing, and weather proofing various products, including carpeting, furniture, clothing, and footwear.

102.    Starting in the mid-1950s and continuing over the next several decades, 3M produced millions of pounds of PFOS and other fluorochemicals for use in Scotchgard and other PFAS products.

103.    In 1973, 3M chemists obtained a patent for the Scotchgard chemical compound.

104.    As detailed below, by the early 1960s, 3M knew that PFAS had toxic effects on

living organisms, and that PFAS from industrial disposal sites would likely pollute domestic wells. By the 1970s, 3M knew that PFAS bioaccumulates in the human body.

105.   Notwithstanding this knowledge, 3M repeatedly and affirmatively concealed the harmful nature of PFAS by misleading the scientific community, regulators, and the public about PFAS's harmful effects, and in so doing, fraudulently concealed the existence of Plaintiffs' and Class members' claims, as well as 3M's liability for same.

106.   In the early 2000s, the EPA put significant pressure on 3M to phase out PFAS's use.

107.   3M caved to the EPA's pressure and phased-out use of PFAS by the mid-2000s.

108.   For 3M's failure to disclose the harmful effects of PFAS, the EPA ultimately fined the company $1.5 million.

109.   3M's fraudulent concealment, however, did not end.  After 3M phased out PFAS, it went to great lengths to ensure it commanded the science concerning these chemicals.  3M called such scientific papers and studies "defensive barriers to litigation."

110.   As further discussed infra at Section D (3), these defensive barriers were created inter alia, through selective funding of outside research and a relationship with Dr. John Giesy, a zoology professor at Michigan State University.

1.   *3M Knew by the 1950s — at the Latest — that PFAS Are Harmful to Human Health.*

111.   3M's PFAS toxicity research began in 1950 and early on confirmed the toxic effects of PFAS.

112.   Throughout the 1950s, 3M's animal studies consistently concluded that PFAS, including PFOA and PFOS, are "toxic."

113.    A 1961 study found that PFAS induced a range of toxic effects, including anesthesia, depression, inhibition of enzymes, metabolic effects, and adverse effects on blood pressure and the sympathetic nervous system.

114.    In the 1970s, 3M undertook additional PFAS toxicity studies, which demonstrated that PFAS were even more toxic than was previously believed.

115.    In 1970, a 3M study revealed a lethal dose of PFAS in fish at 1 ppm, the lowest concentration tested.  At this concentration, the fish were unable to swim upright and died within weeks of being exposed to PFAS.  The fish that received a dose of PFAS at 4 ppm died within days; at 12.5 ppm the fish died within hours; and at 125 ppm the fish died within minutes.

116.    In 1978, the 3M Central Analytical Laboratory conducted a study of PFAS toxicity in Rhesus monkeys, in which every monkey involved in the study died.

117.    The Central Analytical Laboratory repeated the Rhesus monkey experiment the same year at a low dose of 4.5 ppm of PFAS, and still, every monkey involved in the study died.

118.    Despite knowing the toxic nature of its PFAS, 3M concealed all of these studies from Plaintiffs, Class members, and the public.

**2.    *3M Knew by the 1950s — at the Latest — that PFAS Could Reach Domestic Wells Near Disposal Sites.***

119.    Internal 3M documents from the early 1960s confirm that 3M knew that groundwater near waste disposal sites would be contaminated with PFAS.

120.    For example, an internal 3M memo from 1960 recognized that pollutants from industrial wastes dumped at one 3M disposal site "will eventually reach the water table and pollute domestic wells."

121.     In the early 1960s, testing of the groundwater underneath 3M disposal sites confirmed that they, in fact, were contaminated.

21

122.    A 1978 study by 3M on PFOA and PFOS found that "these chemicals are likely to persist in the environment for extended periods unaltered by microbial catabolism."

3.      *3M Knew by the 1970s—at the Latest—that PFAS Was Widely Present in Human Blood and that PFAS Bio-accumulates in the Human Body.*

123.    3M has publicly claimed that it phased out the production of PFAS after it first learned—in 1997—that these chemicals were widely present in the blood of humans.

124.    However, internal 3M documents make clear that 3M knew its PFAS were present in the blood of human beings since at least the 1970s.

125.    In 1973, research into the accumulation of PFAS by the Children's Hospital Research Foundation, using 3M's PFAS, concluded that certain PFAS collected in the liver, where the compounds remained for life.

126.    In August 1975, two academic researchers, W.S. Guy and D.R. Taves, contacted 3M regarding their finding of organic fluorine in blood from blood banks around the country and their belief that 3M's Scotchgard product may have been the source.

127.    According to internal documents, 3M responded to these researchers by "plead[ing] ignorance," and advising the scientists "not to speculate" about whether Scotchgard was the source of the PFAS.

128.    3M subsequently conducted its own research, comparing the spectrum analyses of its own organic fluorine materials against the spectrum analysis of the material identified in the research conducted by Guy and Taves.

129.    In November 1975, 3M's Central Analytical Laboratory reported that the spectrum of $C_8F_{17}SO_3H$, the chemical formula for PFOS, matched the spectrum of the material Guy and Taves had previously identified.

130.    3M was then, and continued to be until the phase-out of its PFAS products, the sole manufacturer of PFOS in the United States.

131.    In 1976, 3M began monitoring the blood of its employees for PFAS.

132.    The early blood samples of 3M employees showed high levels of PFAS in the workers' blood, at 1,000 times normal levels.

133.    According to internal documents, 3M continued monitoring the blood of its employees for PFAS for approximately a decade because the company was "serious[ly] concern[ed]" that PFAS levels in 3M employees were not decreasing and, in some instances, were increasing.

134.    A 1992 internal 3M study of workers at 3M's Chemolite plant in Cottage Grove, Minnesota, found that ten years of employment in PFOA production was associated with a significant three-fold increase in prostate cancer mortality in men.

135.    3M's testing of employee blood samples confirmed that PFAS bio-accumulates and remains in the human body for long periods of time.

136.    Indeed, 3M and E.I. DuPont de Nemours & Co., another producer of PFAS, had been conducting secret studies and medical tests for decades, the results of which indicated that PFAS were toxic, bio-accumulative, and could contaminate the environment and human blood.

137.    The bioaccumulation of PFAS in the human body is significant, as recognized in 1979 by a 3M scientist who noted that PFAS posed a cancer risk because they are "known to persist for a long time in the body and thereby give long-term chronic exposure."

138.    In a 1980 letter to the EPA, 3M's Medical Director detailed an estimated half-life of between 365 and 530 days for perfluorinated chemicals.

139.    In actuality, the half-life is much longer; the elimination half-life in humans is

23

roughly estimated to be 3.5 years for PFOA and 4.8 years for PFOS.

140.    Around 1983, organic fluorine levels in 3M workers' blood showed a steep increase, and 3M's medical services team sent an internal letter stating: "The test results that were reviewed at our meeting seem to substantiate a trend that has been developing over the past 12-18 months – a tendency for these levels in a number of people to no longer show the previous pattern of decline, in fact, a fair number are now demonstrating an increase in blood fluorine levels."  The physician added that, unless the trends change, "we must view this present trend with serious concern.  It is certainly possible that . . . exposure opportunities are providing a potential uptake of fluorochemicals that exceeds excretion capabilities of the body."

141.    These internal studies were not shared with the public or public health agencies, and certainly were never shared with Plaintiffs and Class members.

142.    3M recognized that if the public and regulators became aware of the risks associated with PFAS, it would be forced to halt its manufacturing of PFAS and PFAS-containing products, resulting in the loss of hundreds of millions of dollars in revenue.

143.    Therefore, rather than disclose the harmful effects of PFAS to the government and the public, 3M affirmatively misled the scientific community, regulators, and the public about PFAS's harmful effects, as detailed below.

**4.      *3M Suppressed Scientific Research Into The Harmful Effects of PFAS.***

144.    3M engaged in an intentional, long-term and persistent effort to conceal what it knew about the harmful effects of PFAS.

145.    As part of the effort, 3M engaged in a campaign to distort scientific research concerning PFAS and to suppress research into the potential harms associated with PFAS.

146.    According to internal documents, 3M affirmatively mounted "defensive barriers to

litigation" by "[c]ommand[ing] the science" concerning "exposure, analytical, fate, effects, human health and ecological" risks posed by PFAS.

147.    As part of this effort, 3M provided selective funding for outside research through 3M grant money.

148.    In exchange for providing this grant money to friendly researchers, 3M obtained the right to review and edit draft scientific papers regarding PFAS, and sought control over when and whether the results of scientific studies were published, at all.

149.    Indeed, in internal meeting minutes from 1999, 3M states that "all publications [relating to PFAS] will be reviewed by [3M's] core team and [3M executive] L. Wendling for approval."

150.    As part of this effort, 3M paid Professor John Giesy, an editor of academic journals, millions of dollars to ensure that the harmful effects of PFAS were downplayed in, or removed entirely from, scientific research.

151.    According to internal documents, 3M retained Professor Giesy, in part, to "attend meetings and develop joint [PFAS] projects with Chinese colleagues from whom he can obtain information and over whom he can exert some influence . . . ."

152.    In this capacity, 3M noted that Professor Giesy would need to "buy favors" from scientists in the field.

153.    In an email to 3M, Professor Giesy explained that through his position as an editor of academic journals, he reviewed "about half of the papers published in the area" of PFAS ecotoxicology.

154.    Professor Giesy routinely forwarded confidential manuscripts on PFAS to 3M and rejected at least one article that included negative information on the harmful effects of PFAS on

humans.

155.    As Professor Giesy explained in an email to 3M, his goal was to "keep 'bad' papers [regarding PFAS] out of the literature" because "in litigation situations" those articles "can be a large obstacle to refute."

156.    While working to "review" papers for 3M, Professor Giesy explained that in his time sheets he "always listed these reviews as literature searches so that there was no paper trail to 3M."

**5.    *3M Intentionally Concealed and Destroyed Internal PFAS Documents.***

157.    According to internal documents, 3M also instructed its own employees to avoid creating PFAS-related paper trails.  3M told employees working on the PFAS/fluorochemical project not to write down thoughts or have email discussions because of how those statements could be viewed in the legal discovery process.

158.    If documents relating to PFAS were created, employees were instructed to destroy those documents, including, but not limited to, electronic data concerning PFAS, meeting minutes from 3M's oversight committees relating to PFAS, and talking points related to 3M's ultimate decision to phase-out PFAS products.

159.    Finally, a former 3M scientist and a 3M Medical Director have both publicly stated that they were directed to stamp "attorney-client privilege" on anything they wrote down about PFAS, whether it was actually privileged or not, to avoid the discovery of those documents during litigation.

160.    Through its lies and obfuscations, 3M fraudulently concealed the existence of Plaintiffs' and Class members' claims and 3M's liability for the same.

6.      **3M was Fined for Withholding Critical PFAS Health Data and Finally Phased Out PFAS.**

161.    In 2000, 3M finally informed the EPA that PFAS chemicals are persistent in the environment, have a strong tendency to accumulate in human and animal tissues and can potentially pose a risk to human health and the environment.

162.    The EPA recommended that 3M discontinue the manufacture and use of PFAS in order to protect human health and the environment.

163.    On May 16, 2000, after significant pressure from the EPA, 3M announced that it would phase out PFAS by the end of 2002 because of concerns over what 3M misleadingly claimed was "new information" that the chemical could contaminate the environment and impact human health.

164.    The announcement that 3M would phase out PFAS over the next two years contained false and misleading claims that, "[w]hile this chemistry has been used effectively for more than 40 years and our products are safe, our decision to phase out production is based on our principles of responsible environmental management."

165.    3M made no effort to notify communities in potentially affected areas of the risks associated with exposure to products that contained PFAS compounds.

166.    Under federal law, chemical manufacturers are required to immediately notify the EPA of information that reasonably supports the conclusion that one of their products presents a substantial risk of injury to health or the environment.  *See* 15 U.S.C. § 2607(e) ("TSCA § 8(e)").

167.    3M, however, withheld from the EPA numerous scientific studies relating to the adverse health effects of PFAS, including studies from as early as the 1970s, until after 2000.

168.    Ultimately, the EPA required 3M to pay $1.5 million in penalties for TSCA § 8(e) violations.

E.   **Wolverine's Fraudulent Concealment of the Toxic Nature of PFAS and the Presence of PFAS in Its Products.**

169.   3M informed Wolverine in 1998, via a Material Safety Data Sheet, that PFOS was a component of Scotchgard, that PFOS has the potential to accumulate in the human body with repeated exposure, and that PFOS can resist degradation in the environment.

170.   In January of 1999, 3M informed Wolverine that 3M was working to reduce unnecessary human and environmental exposure to PFOS and invited Wolverine to assist in those efforts, which 3M described as the "prudent and responsible thing to do."

171.   As discussed above, in the early 2000s, pursuant to discussions with the EPA, 3M phased PFOA and PFOS out of its products, including Scotchgard.

172.   Wolverine—a significant 3M customer that heavily relied upon Scotchgard in its manufacturing process—was aware of 3M's phase-out decision, along with the reasons for the phase-out.

173.   Despite knowledge of the harmful effects of PFAS chemicals and the need to limit human and environmental exposure to same, Wolverine requested approval to purchase the PFAS-containing version of Scotchgard through the end of 3M's phase-out process, thus continuing to use, dispose and expose plaintiffs and the class.

174.   3M approved Wolverine's request and agreed to manufacture a sufficient quantity of the "old" version of the product to meet Wolverine's purchasing needs while it converted its other customers to the "new" Scotchgard product that did not contain PFAS.

175.   Despite knowledge of the harmful effects of PFAS chemicals, and the need to limit human and environmental exposure to same, Wolverine continued to use and dispose of PFAS, failed to remediate any of its PFAS dump sites, failed to test and monitor for the presence of PFAS in the ground water, surface water, and well water in the community, and failed to warn the

28

residents of Kent County, including Plaintiffs and Class members, that it had disposed of dangerous, bio-accumulating and persistent PFAS chemicals throughout Kent County, with the potential to contaminate residents' drinking water supplies.

176.   Wolverine, recognizing its exposure for any claims associated with the contamination it caused, was incentivized to hide the devastation it created and its liability for the same.

177.   As detailed below, Wolverine repeatedly and affirmatively concealed the harmful nature of PFAS, the presence of PFAS in its products, and its disposal of PFAS-containing waste within Kent County, thus fraudulently concealing the existence of Plaintiffs' and Class members' claims, as well as the entities liable for the claims, *i.e.*, 3M and Wolverine.

178.   When the Kent County PFAS contamination first became public, Wolverine refused to provide critical documents to the MDEQ concerning the flow of groundwater under Wolverine's House Street disposal site.  Withholding this information delayed the testing of residential wells within the House Street plume for PFAS contamination.

179.   Moreover, Wolverine affirmatively concealed its liability by ghostwriting letters for the MDEQ to send to residents.  These letters informed residents that PFAS had been detected in wells near their homes, asked residents for permission to sample their wells for PFAS, but failed to inform residents that the presence of PFAS in the wells was a result of Wolverine's negligent disposal practices.  Indeed, the letter affirmatively misrepresented the source of the contamination by stating that PFAS is used in many products, including Teflon and Gortex, neither of which are manufactured by Wolverine.

180.   Despite this concealment, local media began to draw connections between the contamination and Wolverine.

29

181.    When local media reached out to Wolverine for comment, the company repeatedly lied, claiming that it did not know PFAS was used in Scotchgard until the fall of 2016.  In one emailed statement, Wolverine said: "[i]n fall 2016, Wolverine first learned that PFOS may have been present in compounds used at its former tannery in Rockford."

182.    In reality, in June of 1999, months after 3M informed Wolverine that PFOS was a component of Scotchgard and advised Wolverine to take steps to limit human exposure to PFOS, a plumbing malfunction at Wolverine's tannery caused Scotchgard to mix directly into the water used for the tannery's drinking fountains.  As a result, several employees became ill.  Thus, no later than this event—and likely much earlier—Wolverine had actual knowledge of the harmful effects of PFAS chemicals and the need to limit human and environmental exposure.

183.    When employees complained, Wolverine repeatedly lied to them, telling them the water was safe.  The company eventually remediated the issue, but continued to lie to its employees, telling them they faced no "long-term risks" from drinking the water.

184.    In 2015, Wolverine considered selling the House Street disposal site.  Although the sale did not go through, during negotiations Wolverine submitted a list of conditions to the potential buyer, including a condition that prohibited the potential buyer from conducting any environmental studies, tests, or evaluations of the House Street property before closing.  Wolverine insisted that this bar on environmental evaluations would apply not only to the potential sale, but also to any future transfer or sale of the property to unknown third persons.   Such language demonstrates Wolverine's affirmative attempts to conceal knowledge of the PFAS-containing waste disposed of at its House Street disposal site.  Upon information and belief, this letter was not disclosed to the MDEQ or any other agency.

185.    Because of Wolverine's lies and misrepresentations, the severity of the

contamination of the tannery's water supply did not become public until March 7, 2018, when Wolverine finally admitted to the contamination in a local news story.

186.    In addition to the tannery, Wolverine operated a factory, wastewater treatment facility and pumping plant, and other buildings on the tannery site, including a maintenance building.  After closing the tannery in 2009, Wolverine demolished most or all of the buildings on the site, in part to conceal its improper actions and inactions.  However, the demolition revealed that toxic wastes were also dumped in a pit beneath the maintenance building where so much waste was disposed that at times the waste rose up through the drains and seeped onto the building's floor.

187.    Wolverine admitted that residents in the communities around its facilities and dump sites "are directly affected by the water issue" and "are worried about it," but continued to assure Plaintiffs, Class members, and the public that "the science is not conclusive" and "soil that has been amended with liquid tannery by-products poses no health impacts to humans or animals, including vegetation that may have been grown in this type of soil."

188.    These assertions by Wolverine are false and were false when made, and upon information and belief, Wolverine knew they were false when it made them.

189.    For decades, Wolverine has known that it was disposing and dumping toxic PFAS containing waste at various sites around Kent County.

190.    Defendants' actions caused the plume to expand, causing new adverse effects to develop by contaminating more homes and drinking water sources.

191.    Nonetheless, Wolverine intentionally failed to notify residents, including Plaintiffs and Class members, of the risk of migration of the chemicals or of the resulting substantial harms to the environment and human health.  It also failed to remediate the environmental contamination

and to address the severe public impacts created by the wrongful disposal.

192. Wolverine fraudulently concealed the existence of Plaintiffs' and Class members' claims and Wolverine's liability for the same.

193. Plaintiffs and Class members justifiably did not discover the causes of action they have against Defendants until water testing revealed that their wells are contaminated with PFAS.

194. As a result of Defendants' disposal, and failure to remediate the contamination they caused, Plaintiffs and Class members are at risk of developing adverse medical conditions, and serious latent diseases.

195. In addition, Plaintiffs and Class members have sustained economic damages related to costs associated with ongoing monitoring of their water and their health.

196. The ongoing nature of the contamination of their properties with PFAS has deprived, and continues to, deprive, Plaintiffs and Class members of the use and enjoyment of their property.

197. Because Defendants fraudulently concealed both the existence of Plaintiffs' and Class members' claims and Defendants' liability for same, the causes of action asserted herein are timely pursuant to MCL 600.5855, as Plaintiffs and Class members commenced this action within two years of the discovery of the PFAS contamination and Defendants' liability for same. Defendants committed affirmative acts and misrepresentations, as set forth herein, which were designed to and did prevent the discovery of the causes of action by Plaintiffs and Class Members.

198. The statute of limitations is governed by the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9658 ("CERCLA"). CERCLA specifically mandates that all state law actions involving personal injury or property damage from a pollutant or contaminant must apply the federal statute of limitations:

> In the case of any action brought under State law for personal injury, or property damages, which are caused or contributed to by exposure to any hazardous substance, or pollutant or contaminant, released into the environment from a facility, if the applicable limitations period for such action (as specified in the State statute of limitations or under common law) provides a commencement date which is earlier than the federally required commencement date, such period shall commence at the federally required commencement date in lieu of the date specified in such State statute.

42 U.S.C. § 9658.

199.    Defendants are equitably estopped from relying upon a statute of limitations defense because of their gross negligence and silence as well as their active and deliberate efforts to deceive Plaintiffs and to conceal their unlawful and grossly negligent conduct.  Through their gross negligence and silence, Defendants encouraged and influenced Plaintiffs and Class Members to act to their disadvantage by consuming PFAS contaminated water and they should be estopped from raising a statute of limitations defense.  Plaintiffs and Class Members did not discover the nature, scope and magnitude of Defendants' misconduct and its full impact on Plaintiffs and could not have acquired such knowledge earlier through the exercise of reasonable diligence.  As set forth herein, Defendants also took active steps to misrepresent material facts:  For example, 3M influenced and distorted the scientific evidence about the hazardous nature of the PFAS chemicals and Wolverine, repeatedly and affirmatively concealed the harmful nature of PFAS, the presence of PFAS in their products and their disposal of PFAS-containing waste in Kent County.

200.    Plaintiffs' and Class Members'  claims should be equitably tolled because any alleged failure to meet any deadline unavoidably arose from circumstances beyond Plaintiffs' and Class Members' control:  (a)  Defendants concealed material facts regarding the hazardous PFAS chemicals that they were manufacturing, selling, using and disposing of in the environment in Kent County, Michigan.  For decades, Defendants misrepresented and fraudulently concealed

33

this activity and the substantial risks to human health and the environment that these chemicals posed; (b) Defendants intended for the public, including these Plaintiffs and Class Members to be deceived by this misconduct such that their activities could continue unabated to the detriment of the community and Plaintiffs and the Class Members; (c) As set forth herein, these Defendants knew the actual facts, to wit that these PFAS chemicals were hazardous and posed a risk to human health and that the disposal and use of same would invade the Plaintiffs' and Class Members' environment, including their water systems.

## CLASS ACTION ALLEGATIONS

201.    Plaintiffs incorporate the preceding paragraphs by reference as if fully set forth at length herein.

202.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3) on behalf of a class of all other persons similarly situated as members of the following proposed class (collectively referred to herein as the "Class" or "Class members"):

> All current or former residents of Kent County who were exposed to PFAS, including but not limited to PFOA and/or PFOS, through drinking water supplied by their residential wells, and/or whose property interests have been impaired by PFAS contamination, including but not limited to PFOA and/or PFOS, or the substantial risk of imminent harm from the continuing increased risk of such contamination.

203.    Excluded from the Class are: (a) Defendants and any entity or division in which Defendants have a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (b) the Judge to whom this case is assigned and the Judge's staff; (c) the attorneys representing any parties to this Class Action; (d) any State or any of its agencies; and (e) the cities, towns, counties, townships, municipalities, and government entities of Kent County.

## A.     Numerosity

204.    The Class is so numerous that joinder is impracticable.  The MDEQ's investigation is ongoing, but has already revealed and identified hundreds of homes within Kent County with wells that have been contaminated with PFAS or are within a zone of probable contamination from a plume.

## B.     Typicality

205.    Plaintiffs' claims are typical of the claims of the members of the Class, Plaintiffs and all Class members have been adversely affected by Defendants' unlawful conduct.

## C.      Adequacy

206.    Plaintiffs will fairly and adequately represent the Class.

207.    Plaintiffs' interests are coincident with and not antagonistic to those of the other members of the Class.

208.    Plaintiffs have retained counsel with substantial experience litigating both environmental torts and class action lawsuits such as this one.

209.    Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class and have the resources with which to do so.

## D.     Commonality and Predominance

210.    Common questions of law and fact exist as to all members of the Class which will drive the resolution of the claims raised.  This is particularly true given the nature of the claims, which focuses on the conduct of Defendants, not of any particular Class member, and which was generally applicable to all the members of the Class, thereby making appropriate relief with respect to the Class as a whole.

211.    Plaintiffs' claims and the claims of all Class members are based on the same legal

and remedial theories arising from exposure to toxic PFAS chemicals and/or nuisance from the actions of Defendants.

212.     All members of the Class have been similarly affected by Defendants' conduct, which conduct has injured Class members by causing them diminished property values and loss of the use and enjoyment of their properties.

213.     Common legal and factual questions include, but are not limited to:

a.      Whether Defendants owed a duty to Plaintiffs and the other members of the Class to refrain from conduct reasonably likely to cause contamination of Class members' well water;

b.      Whether Defendants breached that duty;

c.      Whether Defendants knew or should have known that it was unreasonably dangerous to dispose of and dump PFAS-containing waste into the environment;

d.      Whether Defendants knew or should have known that disposing of PFAS-containing waste in the manner alleged herein was reasonably likely to cause contamination of Plaintiffs and the other Class members' well water;

e.      Whether Defendants breached a legal duty to Plaintiffs and the other Class members by disposing of PFAS-containing waste in the manner alleged herein;

f.      Whether Defendants' breach of a legal duty caused Plaintiffs and the other Class members' well water to become contaminated with PFAS and other hazardous substances;

g.      Whether Defendants knew or should have known that Scotchgard

contained toxic, persistent, mobile, and hazardous chemicals that were likely to contaminate the environment, groundwater, and drinking water;

h.   Whether Defendants' contamination of the environment and water in Kent County, Michigan, including the contamination of Plaintiffs and the other Class members' private wells and the substantial risk of imminent harm from the continuing increased risk of such contamination, caused the devaluation of Plaintiffs and the Class member's property;

i.   Whether Defendants negligently, recklessly, or intentionally exposed Plaintiffs and the other Class members to hazardous PFAS chemicals;

j.   Whether Defendants became aware of the imminent environmental threat posed by Scotchgard and failed to warn Plaintiffs and the other Class members, failed to notify authorities, and failed to take appropriate remedial action; and

k.   Whether Plaintiffs and the other Class members have suffered damages as a result of Defendants' actions.

214.   These common questions of law and fact predominate over any question affecting only individual Class members. Defendants have acted on grounds generally applicable to the entire Class, and the answers to these common questions will advance resolution of the litigation as to all Class members.

**E.     Superiority**

215.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum

simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.

216.    Absent a class action, Class members would likely find the cost of litigating to be prohibitively high and, therefore, would have no effective remedy at law, and the expense and burden of individual litigation would render it impossible for members of the Class to individually redress the wrongs to them.

217.    Plaintiffs know of no difficulty to be encountered in the management of this action as a class action and many examples of similar cases certified as class actions are readily available.

218.    If required, Plaintiffs will propose one or more subclass(es), as the record becomes more developed.

219.    Final equitable or declaratory relief may be appropriate with respect to the Class, in as much as remediation is a common remedy in contamination cases like this one.

## CAUSES OF ACTION

### Count I – Negligence
### Against All Defendants

220.    Plaintiffs incorporate the preceding paragraphs by reference as if fully set forth at length herein.

221.    Defendants knew or should have known that PFAS are toxic to human health, bio-accumulate in the human body, and cause serious adverse health effects, including but not limited to cancer, immune system defects, developmental effects on fetuses exposed during pregnancy or to breastfed infants, liver effects, gastrointestinal effects including ulcerative colitis, and thyroid effects.

222.    Defendants knew or should have known that PFAS are highly soluble in

38

water, highly mobile, volatile, extremely persistent in the environment, and highly likely to contaminate air, soil, and water supplies if released into the environment.

223.   Defendants knew or should have known that the manufacture, use, discharge, and disposal of PFAS could lead to PFAS entering the environment, including the soil and groundwater, and thus required Defendants to take adequate safety precautions to ensure that PFAS were not released into the surrounding environment.

224.   Where released into the environment, Defendants knew or should have known that PFAS contamination would need to be remediated.

225.   Defendants knew or should have known that the manner in which they were manufacturing, using and disposing of PFAS would result in the contamination of, *inter alia*, Plaintiffs' and the Class members' well water.

226.   Defendants owed Plaintiffs and Class members duties to:

   a.   disclose the toxic nature of their products and the waste they were disposing, dumping, and maintaining;

   b.   warn Plaintiffs and the Class members of the dangers PFAS poses to the environment, human health, and property interests;

   c.   act reasonably and not place inherently dangerous products into the marketplace when their discharge into (and subsequent mobility in) the ground and water was imminent and certain;

   d.   take all reasonable measures to ensure PFAS would be effectively contained and not discharged into the surrounding environment;

   e.   properly remediate properties and waters when toxic materials were released into the environment;

   f.   develop, test, manufacture, market, label, sell, use, and/or dispose of and maintain PFAS and products containing PFAS, including waste and sludge, in a manner that would prevent and avoid harm to Plaintiffs and Class members.

   g.   instruct, warn, promulgate rules and guidelines, and train their personnel on

the safe and reasonable use, handling, and disposal of PFAS and all materials treated with or otherwise containing PFAS to ensure that Plaintiffs, Class members, and the environment would not be exposed to and contaminated by hazardous PFAS chemicals;

h.  ensure that the manufacturing and disposal processes they used did not unreasonably endanger Plaintiffs' and the Class members' properties and/or drinking water supplies;

i.  properly maintain and dispose of their toxic waste, including waste and sludge, in a manner that would prevent and avoid harm to those who use and/or are near it;

j.  ensure that the manufacturing and waste disposal processes they used did not contaminate Plaintiffs' and the Class members' private wells with PFAS; and

k.  such other particulars as the evidence may show.

227.  Defendants breached their duties by producing products that were toxic to the environment and human health without properly – indeed unreasonably, wrongfully, and unlawfully – disposing of those products and byproducts, including PFAS and products treated with Scotchgard, in a manner that would likely contaminate the environment in Kent County, including Plaintiffs' and Class members' residential wells, with PFAS and impair Plaintiffs' and Class members' property interests through the presence of PFAS in their wells and/or through the substantial risk of imminent harm from the continuing increased risk of such contamination.

228.  Defendants further breached their duties by failing to warn Plaintiffs and the Class members of the dangers PFAS chemicals pose to the environment,  human health and property interests, failing to disclose the toxic nature of their products and the waste they were disposing, dumping and maintaining, and failing to properly remediate the soil and groundwater where release into the environment occurred.

229.  Defendants further breached their duties by failing to notify Plaintiffs and the

Class members in a timely manner of the toxic chemicals' discharge and subsequent contamination of ground and water.

230.    As a result of Defendants' breaches of their duties, Plaintiffs' and the Class members' property interests have been impaired through the contamination of their wells with PFAS and potentially other hazardous substances and/or through the substantial risk of imminent harm from the continuing increased risk of such contamination.

231.    If Defendants had not breached their duties owed to Plaintiffs and the Class members, Plaintiffs' and the Class members' property interests would not have been impaired by PFAS contamination, they would not face the substantial risk of imminent harm from the continuing increased risk of such contamination, and the damages to Plaintiffs and the Class members would not have occurred.

232.    As a direct and proximate result of Defendants' breach of their duties and the resulting contamination, Plaintiffs and the Class members have suffered and continue to suffer reasonably foreseeable injuries and damages, including, but not limited to, loss of the use and enjoyment of their properties, diminution in the values of their properties, loss of recreational amenities, deprivation of potable water, monetary damages associated with the monitoring and remediation of their water supplies and bodies, fear of toxic chemicals being unknowingly introduced to their bodies, the impairment of their property interests by PFAS contamination or the substantial risk of imminent harm from the continuing increased risk of such contamination and compensatory and consequential damages as set forth below.

233.    Accordingly,    Plaintiffs and the Class members seek damages from Defendants, in an amount to be determined at trial, directly resulting from the injuries to their persons and properties and waters, in a sufficient amount to compensate them for the

injuries and losses sustained and to restore Plaintiffs and the Class members to their original position, including but not limited to the difference between the current value of their properties and such value if the harm had not been done, the cost of repair or restoration, remediation and abatement, the need for medical surveillance as an element of damages, and actual, consequential, and nominal damages, flowing from the negligence which are the natural and proximate result of Defendants' conduct.

### Count II – Private Nuisance
**Against Defendant Wolverine**

234.    Plaintiffs incorporate the preceding paragraphs by reference as if fully set forth at length herein.

235.    Plaintiffs and the Class members, as described above, are owners or occupiers of certain real property and waters with the right of possession and use.

236.    Plaintiffs and the Class members have a right to the use and enjoyment of their properties, including, but not limited to, their land and any residential wells on their properties.

237.    Wolverine's negligent, reckless, and/or intentional conduct, as alleged herein, has impaired Plaintiffs' and Class members' property interests through the contamination of their wells with PFAS and potentially other hazardous substances and/or through the substantial risk of imminent harm from the continuing increased risk of such contamination.

238.    Wolverine exercised sufficient ownership and/or control over the facilities, dump sites, and/or materials leading to the creation of toxic substances used thereon that Wolverine could have prevented the injuries suffered by Plaintiffs and Class members.

239.    Wolverine had a duty to prevent the discharge of PFAS onto Plaintiffs' and Class members' properties, to prevent the PFAS from leaving disposal sites and entering

Plaintiffs' and the Class members' real and personal properties and drinking water, and to prevent the substantial risk of imminent harm from the continuing increased risk of such contamination.

240. Plaintiffs and the Class members did not consent for hazardous substances, including but not limited to PFAS, to physically invade their personal and real property or to create a substantial risk of imminent harm from the continuing increased risk of such contamination.

241. The contamination of Plaintiffs' and the Class members' property and drinking water with PFAS and the impairment of their property interests either through the presence of PFAS in their wells or through the substantial risk of imminent harm from the continuing increased risk of such contamination, has significantly and unreasonably interfered with their right to use and enjoy their properties. Indeed, this offensive and substantial interference has caused Plaintiffs and Class members significant inconvenience, annoyance and harm. It has caused Plaintiffs and the Class members to, *inter alia*, refrain from using water for all daily household purposes, including but not limited to, drinking, cooking, bathing, washing clothes, dishes, which has, and continues to cause significant inconvenience and expense. Wolverine's interference with the physical condition of Plaintiffs' and the Class members' properties has created a disturbance in the comfort and/or conveniences of the properties' occupants, including their peace of mind and threat of future injury that is a present menace and interference with enjoyment.

242. Wolverine's conduct has also substantially interfered with Plaintiffs' and the Class members' ability to avail themselves of their property's value as an asset and/or source of collateral for financing, and to use their property in the manner that each Class Member

decides.

243.     Wolverine's substantial and unreasonable interference with Plaintiffs' and the Class members' use and enjoyment of their property constitute a nuisance for which Wolverine is liable to Plaintiff and Class members for all damages arising therefrom.

244.     As a direct and proximate result of Wolverine's wrongful and intentional acts and omissions as alleged herein, Plaintiffs and the Class members have incurred, and will continue to incur, costs and expenses related to the investigation, treatment, remediation, and monitoring of drinking water and the contamination of their respective properties in an amount to be determined at trial.

### Count III – Public Nuisance
### Against Defendant Wolverine

245.     Plaintiffs incorporate the preceding paragraphs by reference as if fully set forth at length herein.

246.     Plaintiffs and the Class members, as members of the general public, have a common right to safe drinking water and to live in an environment where PFAS does not threaten their health or interfere with their right to use and enjoyment of public amenities, including lakes, rivers, ponds, creeks, and their banks; beaches; other land; ground and surface water; and drinking water supplies.

247.     Wolverine, through the negligent, reckless, and/or intentional acts and omissions alleged herein, has unreasonably interfered with the rights of Plaintiffs and Class members by causing the drinking water, environment, and areas in which Plaintiffs and the Class members live and own property to become contaminated with toxic and hazardous chemicals, including but not limited to, PFAS.

248.     Wolverine's   wrongful   actions   and   inactions   in   causing   this   toxic

contamination have significantly interfered with the public's health, safety, peace, comfort, and convenience.

249.    Wolverine had a duty to prevent PFAS from migrating from its disposal sites and into public amenities, including lakes, rivers, ponds, creeks, and their banks; beaches; other land; ground and surface water; and drinking water supplies.

250.    Wolverine knew, or should have known, that its wrongful conduct in repeatedly, continuously and systematically causing, contributing to, and exacerbating this toxic PFAS contamination of the areas in which Plaintiffs and the Class members live and own property would and has produced a permanent and/or long-lasting infringement on public rights.

251.    Plaintiffs' and the Class members' damages as a result of Wolverine's conduct are of a special character and distinct from those suffered by the general public because Plaintiffs and the Class members have actually been exposed to the aforementioned PFAS.

252.    Plaintiffs and the Class members did not consent for PFAS to physically invade the aforementioned public amenities.

253.    Wolverine's substantial and unreasonable interference with Plaintiffs' and the Class members' use and enjoyment of the public amenities described herein constitutes a nuisance for which Wolverine is liable to Plaintiffs and Class members.

254.    As a direct and proximate result of Wolverine's wrongful and intentional acts and omissions as alleged herein, Plaintiffs and the Class members have incurred, and will continue to incur, costs and expenses related to the investigation, treatment, remediation, and monitoring of drinking water and the contamination of their respective properties, as well as the damages set forth below, in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

As a result of the aforementioned acts and omissions of Defendants, Plaintiffs seek relief on behalf of themselves and the Class, including, but not limited to:

a. Monetary damages for each violation of Counts I through IV:

    i. sufficient to remediate Plaintiffs' and Class members' properties from the contamination caused by Defendants' conduct;

    ii. to compensate Plaintiffs and Class members for the diminution in the value of their properties caused by Defendants' conduct;

    iii. to compensate Plaintiffs and Class members for the loss of use and enjoyment of their properties caused by Defendants' conduct;

    iv. to compensate Plaintiffs and Class members for the increased cost to obtain potable water, including the costs of alternative potable water sources or the installation and maintenance of an adequate filtration system; and

    v. for such other monetary damages that are required to fully compensate Plaintiffs and Class members for the loss of value, use, and enjoyment of their properties caused by Defendants' conduct.

b. Plaintiffs seek injunctive relief on behalf of themselves and the Class, including but not limited to, an order requiring Defendants:

    i. to fully remediate Plaintiffs' and Class members' properties so that Plaintiffs' and Class members' properties are free from the presence of PFAS, and to provide Plaintiffs and Class members with alternative, comparable housing during the remediation period;

    ii. to conduct mandatory ongoing testing for PFAS and other chemical substances in Plaintiffs' and the Class members' water supplies, and ongoing remediation of those substances as necessary;

    iii. to provide access to alternative water supplies;

    iv. to establish and implement a biomedical surveillance program for Plaintiffs and Class members for early diagnosis and treatment for the cancers, diseases, and disorders caused by PFAS exposure. Such a program would potentially include, but not be limited to, blood serum tests, scans, urine tests, and physicals examinations.

c.   Any and all equitable relief that the Court deems proper and just;

d.   An order certifying the proposed Class, designating Plaintiffs as the named representatives of the respective Class members, and appointing Plaintiffs' counsel as  Class Counsel;

e.   An order estopping Defendants from raising any and all defenses pertaining to the timeliness of Plaintiffs' and the Class's claims;

f.   An award to Plaintiffs and Class members of compensatory, exemplary, and consequential damages, including interest in an amount to be proven at trial;

g.   An award of attorneys' fees and costs;

h.   An award of pre-judgment and post-judgment interest as provided by law; and

i.   Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a jury on all issues triable by a jury set forth in this Second Amended Consolidated Class Action Complaint.

Dated: May 20, 2019                    Respectfully submitted,


*/s/ Sharon S. Almonrode*
Sharon S. Almonrode (P33938)
Emily E, Hughes (P68724)
William Kalas (P82113)
THE MILLER LAW FIRM, P.C.
950 W. University Drive, Suite 300
Rochester, MI 48307
Telephone: (248) 841-2200
ssa@millerlawpc.com
eeh@millerlawpc.com
wk@millerlawpc.com

Paul F. Novak (P39524)
Diana Gjonaj (P74637)
WEITZ & LUXENBERG, P.C.

47

3011 W. Grand Boulevard, Suite 2150
Detroit, MI 48202
Telephone: (313) 800-4170
pnovak@weitzlux.com
dgjonaj@weitzlux.com

Robin L. Greenwald*
WEITZ & LUXENBERG, P.C.
700 Broadway
New York, NY 10003
Telephone: (212) 558-5642
rgreenwald@weitzlux.com

Mark J. Dearman
Jason H. Alperstein
Dorothy P. Antullis
ROBBINS, GELLER, RUDMAN AND
DOWD LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: (561) 750-3000
mdearman@rgrdlaw.com
jalperstein@rgrdlaw.com
dantullis@rgrdlaw.com

*Attorneys for Zimmerman Plaintiffs and Putative
Class*

***

*/s/ Esther Berezofsky*
Esther Berezofsky (P00148)
Sarah Hansel (P00152)
MOTLEY RICE, LLC
210 Lake Drive East, Ste. 101
Cherry Hill, NJ 08002
(856) 667-0500

Anne McGinness Kearse
T. David Hoyle
Fidelma L. Fitzpatrick
MOTLEY RICE, LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
(843) 216-9140

48

Edward A. Wallace
Kara A. Elgersma
Wexler Wallace, LLP
55 W. Monroe St., Ste. 3300
Chicago, IL 60603
(312) 346-2222

Robert Palmer (P31704)
Megan A. Bonanni (P52079)
Jennifer Lord (P46912)
Pitt, McGehee, Palmer & Rivers, PC
117 West 4th Street, Ste. 200
Royal Oak, MI 48067
(248) 398-9800

Jason J. Thompson (P47184)
Sommers Schwartz, P.C.
One Towne Square, 17th Floor
Southfield, MI 48076
(248) 355-0300
jthompson@sommerspc.com

*Attorneys for Johns Plaintiffs and Putative Class*

*/s/ Alastair J.M. Findeis*
Alastair J.M. Findeis
NAPOLI SHKOLNIK PLLC
360 Lexington Ave., 11th Fl.
New York, NY 10017
Telephone: (212) 397-1000
afindeis@NapoliLaw.com

*Attorneys for Henry Plaintiffs and Putative Class*